Brandon M. Tesser (SBN: 168476)
Robert Paredes (SBN 255329)
TESSER | GROSSMAN LLP
11726 San Vicente Blvd., Ste. 450
Los Angeles, CA 90049
Tel: 310-207-4558
Email: brandon@tessergrossman.com
        robert@tessergrossman.com

Attorney for Plaintiffs
WILD PACIFIC MEDIA PTY LTD and
WPM HOLDINGS PTY LTD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILD PACIFIC MEDIA PTY LTD, an Australian proprietary limited company; and WPM HOLDINGS PTY LTD, an Australian proprietary limited company,<br><br>Plaintiffs,<br><br>v.<br><br>K2 COMMUNICATIONS, INC., a California corporation d/b/a K2 STUDIOS; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>**(1) Copyright Infringement (17 U.S.C. § 501);**<br>**(2) Breach of Written Contract (Ancient Australia Distribution Agreement);**<br>**(3) Breach of Written Contract (Ocean Odyssey Distribution Agreement);**<br>**(4) Breach of Written Contract (Wild Continent Distribution Agreement); and**<br>**(5) Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiffs Wild Pacific Media Pty Ltd ("WPM") and WPM Holdings Pty Ltd ("WPM Holdings") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby allege as follows against Defendant K2 Communications, Inc., a California corporation doing business as K2 Studios ("K2" or "Defendant"):

**PARTIES**

1. Plaintiff Wild Pacific Media Pty Ltd is an Australian proprietary limited company with its principal place of business in New South Wales, Australia. WPM is engaged in the business of producing natural history and documentary films and television programs, including giant-screen and IMAX® format films. At all relevant times, WPM owned, and together with its wholly-owned subsidiary WPM Holdings continues to own, the natural history footage described herein (the "WPM Footage").

2. Plaintiff WPM Holdings Pty Ltd is an Australian proprietary limited company, wholly owned by the same shareholders as WPM, with its principal place of business in New South Wales, Australia. WPM Holdings is the rights-holder and contracting party under the Wild Continent Distribution Agreement described below.

3. Defendant K2 Communications, Inc. is a California corporation with its principal place of business at 880 Apollo Street, Suite 239, El Segundo, California 90245 ("K2"). K2 conducts business under the trade name "K2 Studios." In certain contracts, correspondence, and accountings, K2 is alternatively referred to as "K2 Communications LLC" or "K2 Communications LLC t/a K2 Studios," which references constitute scrivener's errors or misnomers and do not alter the identity of the contracting or acting party. The entity that is the signatory to the contracts referenced herein, that has distributed the films and productions referenced herein, and that is the subject of this action, is K2 Communications, Inc. K2 is in the business of distributing giant-screen and IMAX® documentary films and television programs. At all relevant times, K2 served as the contracted United States distributor for the WPM-produced films described herein pursuant to the written Distribution Agreements described below. 4. Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate, or

1

**COMPLAINT**

otherwise, of the defendants named herein as Does 1 through 10, and therefore sue such defendants by those fictitious names. Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of the Doe Defendants when the same have been ascertained. Plaintiffs are informed and believe, and on that basis allege, that each Doe Defendant is responsible in some manner for the acts, omissions, and conduct alleged herein and for the damages sustained by Plaintiffs.

5. Plaintiffs are informed and believe, and on that basis allege, that at all relevant times each Defendant was the agent, servant, employee, alter ego, or co-conspirator of the remaining Defendants, and in performing the acts alleged herein was acting within the course and scope of such agency, employment, and conspiracy.

**JURISDICTION AND VENUE**

6. This Court has subject-matter jurisdiction over Plaintiffs' First Cause of Action pursuant to 28 U.S.C. §§ 1331 and 1338(a), as that claim arises under the Copyright Act of 1976, 17 U.S.C. § 101 et seq.

7. This Court has subject-matter jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1332(a)(2), as Plaintiffs are citizens and subjects of a foreign state (Australia), K2 is a citizen of California (being incorporated under the laws of California and maintaining its principal place of business in California), and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a), as they form part of the same case or controversy as the First Cause of Action.

8. This Court has personal jurisdiction over K2 because K2 is incorporated under the laws of California, maintains its principal place of business in this District, and a substantial part of the acts and omissions giving rise to this action occurred in this District.

///

///

///

2

**COMPLAINT**

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a), because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### A.      WPM and Its Documentary Films

10.      WPM is a natural history and science documentary production company founded and led by Emmy Award-winning cinematographer Nick Robinson. Over more than a decade, WPM has produced a slate of premium giant-screen and IMAX® documentary films, as well as television documentary series, which have been distributed internationally. WPM's films include, among others, *Ancient Australia* a/ka/ *Australia's Great Wild North*); *Wonders of the EAC* aka *Ocean Odyssey 3D*); and *Australia: The Wild Continent* (collectively, the "WPM Projects").

11.      In the course of producing the WPM Projects and other documentary works, WPM and WPM Holdings created and assembled an extensive proprietary archive of original natural history footage, including footage of marine life, Australian wildlife, landscapes, and related subjects (the "WPM Footage"). The WPM Footage constitutes original works of authorship, fixed in tangible media, created by WPM and first published in Australia.

### B.      The WPM Footage Is Protected Under the Berne Convention

12.      The WPM Footage consists of original works of authorship created by WPM and first published in Australia. Australia is a member country of the Berne Convention for the Protection of Literary and Artistic Works (the "Berne Convention"), to which the United States has been a member since March 1, 1989.

13.      Pursuant to 17 U.S.C. §§ 101 and 104(b)(2), the WPM Footage constitutes "foreign works" that are entitled to copyright protection in the United States. Plaintiffs may maintain this action for infringement of the WPM Footage without prior registration of the WPM Footage with the United States Copyright Office. See 17 U.S.C. § 411(a).

3

**COMPLAINT**

14.     At all relevant times, WPM and/or WPM Holdings has been, and remains, the owner of the copyright in the WPM Footage. Neither WPM nor WPM Holdings has ever assigned, licensed, or otherwise transferred its copyright interests in the WPM Footage to K2 or to any other entity associated with the Unauthorized Productions described below.

**C.     K2's Distribution of Unauthorized Productions Incorporating the WPM Footage**

15.     Upon information and belief, K2 is the United States distributor for at least two productions that incorporate substantial quantities of WPM Footage: (a) *Animal Kingdom IMAX* aka *Animal Kingdom 3D: A Tale of Six Families*) a motion picture produced by Reptile Film SPV Pty Ltd and David Gross (the "Animal Kingdom Film"); and (b) *Great Species of the South Seas*, a television documentary series produced by Great Species TV Pty Ltd and David Gross (the "Great Species Series") (collectively, the "Unauthorized Productions"). Upon information and belief, the WPM Footage incorporated into the Unauthorized Productions was supplied by David Gross without any license or authorization from WPM or WPM Holdings.

16.     The Unauthorized Productions incorporate substantial quantities of WPM Footage originating from WPM's raw archives. Upon information and belief, nearly one-half of the shots in the Animal Kingdom Film incorporate footage that is either wholly or partially owned by WPM or WPM Holdings, and approximately one hour of the Great Species Series incorporates WPM Footage.

17.     No license, release, or other authorization was ever granted by WPM or WPM Holdings for the use of any WPM Footage in either of the Unauthorized Productions. No written or oral license agreement has ever been executed between WPM or WPM Holdings, on the one hand, and K2, the producers of the Unauthorized Productions, or any other party, on the other hand, authorizing the use of the WPM Footage in the Unauthorized Productions. No compensation has ever been paid to WPM or WPM Holdings for any such use.

**COMPLAINT**

18. Prior to the filing of this action, Plaintiffs provided K2 with written notice on multiple occasions that the Unauthorized Productions incorporate WPM Footage without authorization and demanded that K2 cease and desist from further distribution of the Unauthorized Productions. Notwithstanding these notices, K2 has continued to market, sell, broadcast, distribute, license, and/or display the Unauthorized Productions within the United States.

**D.     The Distribution Agreements**

19. In addition to K2's unauthorized and infringing distribution described above, K2 separately breached its contractual obligations to Plaintiffs as the contracted distributor for three WPM Projects pursuant to written distribution agreements between K2 and WPM (collectively, the "Distribution Agreements") as discussed in further detail hereinbelow.  Although the Distribution Agreements differ in certain respects, they share the following common structural features.

20. Each Distribution Agreement grants K2 the exclusive right to distribute a specified film in a defined territory, in exchange for a distribution fee and, in the case of the Ocean Odyssey and Wild Continent Agreements, contracted cash advances against gross receipts.

21. Each Distribution Agreement entitles K2 to a distribution fee equal to 25% of gross receipts, or 35% inclusive of sub-distributor fees where a sub-distributor approved in writing by the contracting WPM entity has been engaged.

22. Each Distribution Agreement requires K2 to render periodic royalty statements to the contracting WPM entity setting forth, in reasonable detail, the nature, source, and amount of all gross receipts derived from the distribution of the film, all distribution fees deducted, and all distribution expenses. Each Distribution Agreement further requires K2 to maintain proper, accurate, and complete books and records in connection with its exploitation of the film.

///

///

5

**COMPLAINT**

23.     Each Distribution Agreement grants the contracting WPM entity the right to audit K2's books and records relating to the film, upon reasonable prior notice. In each case, if an audit reveals an underpayment in excess of specified thresholds, K2 is obligated to pay the shortfall and to bear the reasonable costs of the audit.

**E.     The Ancient Australia Distribution Agreement**

24.     On or about June 24, 2018, WPM and K2 entered into a written distribution agreement for the motion picture Ancient Australia (also distributed under the title Australia's Great Wild North) (the "Ancient Australia Agreement").  A true and correct copy of the Ancient Australia Agreement is attached as **Exhibit A** and incorporated herein by reference.

25.     Under the Ancient Australia Agreement, K2 serves as WPM's exclusive distributor in the Territory, defined as the world, excluding Australia and New Zealand. The initial term is seven (7) years from delivery, with an automatic seven-year renewal unless canceled at least 90 days before the end of the initial term.

26.     Section 10 of the Ancient Australia Agreement ("Fees, Royalties & Expenses") sets forth the distribution waterfall. It provides:

> Gross receipts shall be actual monies received by K2 from an Exhibitor, converted to US dollars at the time of transfer, after the deduction of withholding taxes, if any, and bank transfer fees, if any. The distribution of gross receipts will proceed as follows:
> K2 shall recoup a Distribution Fee equal to 25% of gross receipts or 35% if a sub-distributor is used. K2 shall retain 100% of all Distribution Expenses advanced on behalf of the Company, for distribution of the Film. 100% of the remaining proceeds shall be paid to the Company.

27.     Section 10 further defines "Distribution Expenses" as those expenses for which K2 is entitled to recoup from gross receipts, including "un-recouped print expenses, shipping and handling charges incurred in the delivery of DVDs used for screening/promotional purposes, costs related to the production and purchase of advertisements, advertorials or promotional materials whether in print or digital form,

6

**COMPLAINT**

screening/promotional activities at Film markets, or any other expenses reasonably deemed appropriate by K2, for which COMPANY shall have the right to approve in advance." Section 10 further requires that K2 "separately identify any expenses under the preceding sentence."

28.     Section 15 of the Ancient Australia Agreement ("Contracts & Accounting") requires K2 to render royalty statements quarterly.  All reports, updates and payments are due no later than 45 days after the end of each calendar period.

29.     Section 17 of the Ancient Australia Agreement ("Audits") grants WPM the right to audit K2's books and records relating to the film for any item not deemed incontestable, upon at least one month's prior notice, once annually during the Term and until one year after the end of the Term. Section 17 further provides that if an audit reveals an underpayment of more than 5% in excess of USD $2,500, K2 must pay on demand both the underpayment and the reasonable costs of the audit.

30.     Section 16 of the Ancient Australia Agreement authorizes termination as a remedy under specified circumstances. Section 16(a) provides that "The COMPANY shall be entitled in addition to all its other rights and remedies at law and at its option upon giving written notice to K2 to terminate this Agreement forthwith if . . . (i) the K2 fails to perform any material obligation required of it hereunder and shall not insofar as possible have cured or remedied such failure within thirty (30) days of written notification thereof." Section 16(b) further provides that, upon expiration of the agreement, all prints and other materials in K2's possession (other than those sold or destroyed) shall be returned to WPM, and K2 shall have no further entitlements to any receipts from the film.

**F.     The Ocean Odyssey (Wonders of the EAC) Distribution Agreement**

31.     On or about July 27, 2018, WPM entered into a written distribution agreement with K2 and K2 Films Australia Pty Ltd ("K2 Australia") for the motion picture Wonders of the EAC aka Ocean Odyssey 3D) (the "Ocean Odyssey Agreement"). The Ocean Odyssey Agreement was subsequently amended by a written Distribution Agreement Amendment executed as of May 22, 2020 (the "Ocean Odyssey

7

**COMPLAINT**

Amendment"). True and correct copies of the Ocean Odyssey Agreement and the Ocean Odyssey Amendment are attached hereto as **Exhibit B** and **Exhibit B-1,** respectively, and incorporated herein by reference.

32.     The Ocean Odyssey Agreement expressly designates K2 (denominated "K2 Intl" therein) and K2 Films Australia Pty Ltd (denominated "K2 Australia" therein) as "jointly and severally together . . . K2." K2 is therefore jointly and severally liable for all obligations of "K2" arising under the Ocean Odyssey Agreement and the Ocean Odyssey Amendment.

33.     Under the Ocean Odyssey Agreement, K2 serves as WPM's exclusive distributor of the film worldwide, with K2 handling distribution in the Territory excluding Australia and New Zealand (the "ROW Territory"), and K2 Australia handling distribution in Australia and New Zealand (the "ANZ Territory"). The initial term is seven (7) years from delivery, with an automatic seven-year renewal and further extension if amounts remain outstanding at the end of the initial term.

34.     Section 1(i)(ii) of the Ocean Odyssey Agreement provides for a contracted K2 ROW Advance against gross receipts originally in the amount of A$2,275,000, payable in seven installments. Section 1(i)(i) provides for a contracted K2 Australia Advance of A$225,000. The Ocean Odyssey Amendment increased the K2 ROW Advance to A$2,503,000 "in consideration of the cost of the Additional Delivery Materials.".

35.     Section 1(c) of the Ocean Odyssey Agreement (as modified by the Ocean Odyssey Amendment) defines "Distribution Expenses" and caps them, as follows:

> Distribution Expenses shall mean expenses associated with direct distribution efforts of the Film which shall be limited to 10% of the Gross Receipts in year 1 and 5% of the Gross Receipts each year of the Term thereafter, unless otherwise approved by the COMPANY, and shall include third party arms-length cost incurred by K2 . . . or any other expenses reasonably deemed appropriate by K2, for which COMPANY shall have the right to approve in advance.

8

**COMPLAINT**

36. Section 8(c) of the Ocean Odyssey Agreement sets forth the contracted distribution waterfall for the application of gross receipts: (i) first, to K2 in recoupment of Distribution Expenses; (ii) second, to K2 as its Distribution Fee; (iii) third, to K2 in recoupment of the K2 Advance; and (iv) fourth, the balance to WPM as "COMPANY."

37. Section 12(a) of the Ocean Odyssey Agreement requires K2 to render royalty statements within 30 days of the expiration of each Accounting Period. The Accounting Period is defined as quarterly throughout the first two years of the Term following delivery, and thereafter semi-annually ending on each June 30 and December 31 for the remainder of the Term. Each statement must be rendered in reasonable detail on a current and cumulative basis.

38. Section 12(c) of the Ocean Odyssey Agreement grants WPM the right to audit K2's books and records relating to the film, upon 14 days' prior notice, no more than once per twelve-month period. Section 12(c)(iii) provides that, if an audit reveals an underpayment of 10% or more of the amount properly due, or an underpayment in excess of A$5,000, whichever is greater, K2 must pay the reasonable costs of the audit (excluding travel and accommodation) and the deficiency identified by the audit within 30 days of notice.

39. Section 13(a) of the Ocean Odyssey Agreement authorizes termination of the agreement by written notice in the event of material breach. Section 13(a)(ii) provides for a 30-day cure period following notice of material breach. The final subclause of Section 13(a) further provides: "The parties acknowledge that with respect to subclauses (i) and (ii) above, the only breach of this Agreement that may be deemed an Event of Default on behalf of K2 shall be a failure of K2 Australia to make full payment of the K2 Australia Advance and the K2 ROW Advance in accordance with the terms herein" (the "Default Term"). As alleged below, the Default Term is illusory, unconscionable, and unenforceable.

///

///

9

**COMPLAINT**

**G.    The Wild Continent Distribution Agreement**

40.    On or about October 31, 2022, WPM Holdings entered into a written distribution agreement with K2 and K2 Films Australia Pty Ltd for the motion picture Australia: The Wild Continent (the "Wild Continent Agreement"). A true and correct copy of the Wild Continent Agreement is attached as **Exhibit C** and incorporated herein by reference. WPM Holdings is the contracting party under the Wild Continent Agreement.

41.    Under the Wild Continent Agreement, K2 serves as WPM Holdings' exclusive distributor of the film worldwide, with K2 handling distribution in the ROW Territory and K2 Films Australia Pty Ltd handling distribution in the ANZ Territory. The Delivery Date is October 29, 2023. The initial term is seven (7) years from the Delivery Date.

42.    Section 1(i) of the Wild Continent Agreement provides for a contracted K2 ROW Advance against gross receipts in the amount of A$2,325,000, payable in seven installments. Section 1(h) provides for a contracted K2 Australia Advance of A$175,000. Section 1(n) provides for a contracted ROW "Prints & Advertising" commitment of USD $250,000, and Section 1(m) provides for a contracted ANZ "Prints & Advertising" commitment of A$100,000.

43.    Section 1(c) of the Wild Continent Agreement defines "Distribution Expenses" and caps them, as follows:

> Distribution Expenses shall mean expenses associated with direct distribution efforts of the Film which shall be limited to 10% of the Gross Receipts in year 1 and 5% of the Gross Receipts each year of the Term thereafter, unless otherwise approved by the COMPANY.

44.    Section 8(b) of the Wild Continent Agreement requires K2 to report and account to WPM Holdings separately for the ROW Territory and the ANZ Territory, with separate waterfall applications for each territory.

///

10

**COMPLAINT**

45. Section 8(c) of the Wild Continent Agreement sets forth the contracted distribution waterfall for the application of gross receipts in each territory: (i) first, to K2 in recoupment of Distribution Expenses, subject to the Section 1(c) cap; (ii) second, to K2 as its Distribution Fee; (iii) third, to K2 in recoupment of the K2 Advance applicable to that territory; and (iv) fourth, the balance to WPM Holdings as "COMPANY."

46. Section 10 of the Wild Continent Agreement provides that any "Prints and Advertising" expenditures made by K2 shall be recouped by K2 "as a Distribution Expense" — that is, subject to the Section 1(c) cap, rather than as a separate category of recoupable cost outside the cap.

47. Section 12(a) of the Wild Continent Agreement requires K2 to render quarterly royalty statements during the first two years from delivery, and semi-annual statements thereafter, each within 30 days of the end of the applicable Accounting Period, in reasonable detail on a current and cumulative basis.

48. Section 12(c) of the Wild Continent Agreement grants WPM Holdings the right to audit K2's books and records, upon 14 days' prior notice, no more than once per twelve-month period. Section 12(c)(iii) provides that, if an audit reveals an underpayment of 10% or more of the amount properly due or an underpayment in excess of A$5,000, whichever is greater, K2 must pay the reasonable costs of the audit and the deficiency identified by the audit within 30 days.

49. Section 13(a) of the Wild Continent Agreement authorizes termination of the agreement by written notice in the event of material breach. Section 13(a)(ii) provides for a 30-day cure period following notice of material breach. The final subclause of Section 13(a) further provides, substantively identical to the corresponding provision in the Ocean Odyssey Agreement, that the only breach that may be deemed an Event of Default on behalf of K2 shall be a failure of K2 Australia to make full payment of the K2 Australia Advance and the K2 ROW Advance (the "Default Term"). As alleged below, the Default Term is illusory, unconscionable, and unenforceable.

///

11

**COMPLAINT**

**H.   The GHJ Audit and K2's Admitted Breaches**

50.   In April 2024, after years of unsuccessful efforts to obtain compliant royalty reporting from K2, WPM and WPM Holdings engaged Green Hasson Janks LLP ("GHJ"), an independent certified public accounting firm specializing in profit-participation audits, to conduct an audit of K2's books and records relating to Australia: The Wild Continent. On November 1, 2024, GHJ issued its written audit report (the "GHJ Audit Report") to WPM Holdings.

51.   The GHJ Audit Report identifies multiple material breaches of the Wild Continent Agreement. Among the items identified by GHJ as "Items Agreed to be Adjusted" — that is, breaches that K2 has acknowledged but not cured — are the following:

    a.   Consolidated Reporting Contrary to Section 8(b). K2 reported gross receipts, distribution expenses, distribution fees, and the recoupment of advances on a consolidated worldwide basis rather than separately for the ROW Territory and the ANZ Territory as required by Section 8(b) of the Wild Continent Agreement. K2 acknowledged that the Wild Continent Agreement requires separate territorial reporting, and agreed to adjust its accountings accordingly, but has not done so.

    b.   Overstated Distribution Expenses Contrary to Section 1(c). On the Initial Statement rendered by K2 for Australia: The Wild Continent, K2 charged Distribution Expenses of USD $131,110 against gross receipts. Under the Section 1(c) cap of 10% of gross receipts in Year 1, K2's permissible Distribution Expenses on the Initial Statement were limited to USD $1,750. K2 accordingly overstated Distribution Expenses on the Initial Statement by USD $129,360. K2 acknowledged that its Distribution Expenses as reported exceeded the Section 1(c) cap, but has not cured the overstatement.

///

**COMPLAINT**

52.     The GHJ Audit Report also identifies an "Error Identified" concerning K2's treatment of Prints and Advertising expenditures: K2 charged USD $250,000 of ROW Prints and Advertising against gross receipts as a separate line item outside the Section 1(c) cap, rather than recouping Prints and Advertising "as a Distribution Expense" subject to the cap as required by Section 10 of the Wild Continent Agreement.

53.     In written correspondence dated March 7, 2025, K2's president Mark Kresser confirmed K2's position that "all costs, including PR and marketing costs, and P&A, will be reserved and deducted only once Minimum Guarantees are recouped." That position is contrary to the express terms of the Distribution Agreements, which require Distribution Expenses to be reported in, and capped during, each reporting period, not deferred until after recoupment of advances.

54.     On March 31, 2025, Plaintiffs, through Australian counsel, served upon K2 directly at K2's El Segundo, California address — and by email upon Mark Kresser, K2's president, and other K2 officers — a written Notice of Material Breach of the Ancient Australia Agreement, the Ocean Odyssey Agreement, and the Wild Continent Agreement (the "Material Breach Notice"), identifying K2's material breaches of Sections 12(a) and 15 (reporting) and the other obligations described herein, and demanding that K2 cure those breaches, including by rendering comprehensive compliant reporting for each of the Distribution Agreements, by close of business by no later than April 30, 2025. K2 did not cure any of the identified material breaches within the 30-day cure period, and has not cured any of them to date. In addition, following receipt of the GHJ Audit Report, Plaintiffs demanded through prior communications that K2 (a) issue corrected royalty statements for Australia: The Wild Continent reflecting separate ROW and ANZ accountings and the removal of expenses in excess of the Section 1(c) cap; (b) reclassify the USD $250,000 of ROW Prints and Advertising as a Distribution Expense subject to the Section 1(c) cap; and (c) account for and pay any amounts shown to be owing to WPM Holdings after such corrections. K2 has refused and continues to refuse to cure these breaches.

13

**COMPLAINT**

## I.    K2's Concealment and Obstruction of Discovery

55.    Plaintiffs' ability to discover the full extent of K2's breaches has been materially obstructed and delayed by K2's conduct, including as follows.

56.    From in or about 2018 onward, WPM repeatedly requested from K2 proper, accurate, and complete periodic royalty statements for Ancient Australia in the form required by the Ancient Australia Agreement. For approximately two and one-half years following initial delivery of the film in 2018, K2 failed to render any compliant distribution report to WPM for Ancient Australia. During that period, K2 remitted a single payment to WPM on or about May 22, 2019, in the amount of USD $51,835, without any supporting accounting reflecting how that amount had been calculated.

57.    On or about February 5, 2021, K2 transmitted to WPM a screenshot of a single spreadsheet purporting to summarize revenues for Ancient Australia. That screenshot did not contain the detail required by the Ancient Australia Agreement and was plainly insufficient to permit WPM to assess K2's performance or to audit K2's books and records.

58.    K2's pattern of non-reporting and inadequate reporting continued across the other Distribution Agreements. For the Ocean Odyssey Agreement, K2 failed to provide compliant quarterly statements as required by Section 12(a). For the Wild Continent Agreement, following delivery of the film on October 29, 2023, the only reporting rendered in respect of the Australia: The Wild Continent film has been a single Q4 2023 report provided through K2's affiliate K2 Films Australia Pty Ltd in or about April 2024. K2 has not provided any of the other quarterly statements required by Section 12(a) of the Wild Continent Agreement for Accounting Periods since delivery.

59.    In April 2024, WPM and WPM Holdings' Australian counsel formally demanded from K2 up-to-date and compliant distribution reports for all three WPM Projects. In or about June 2024, WPM and WPM Holdings served formal audit notices upon K2 pursuant to the audit provisions of each Distribution Agreement.

///

14

**COMPLAINT**

60.     For a period exceeding twelve months, K2 delayed and obstructed the audit process, including but not limited to: (a) extensively negotiating non-disclosure agreement terms with WPM's auditors over a period of weeks before agreeing to the form of non-disclosure agreement covering Australia: The Wild Continent (the "AWC NDA"), and including in the AWC NDA terms that exceed those reflecting industry custom and practice for profit-participation audits; (b) thereafter demanding separate non-disclosure agreements for the audits of Ancient Australia and Ocean Odyssey, notwithstanding that the operative provisions of the AWC NDA were substantively applicable to those audits; (c) failing to provide a draft non-disclosure agreement for Ocean Odyssey for more than two months after WPM's auditors first requested it on September 24, 2024, and failing to provide any draft non-disclosure agreement for Ancient Australia at all during the relevant period, with the practical effect that GHJ was able to audit only Australia: The Wild Continent within the audit window despite WPM's prior service of audit notices on all three films; (d) conditioning negotiation of further non-disclosure agreements on K2's prior review of the audit report on Australia: The Wild Continent — a precondition not contemplated by the Distribution Agreements; (e) producing limited and incomplete source records to GHJ during the audit; and (f) refusing to facilitate independent verification of K2's reported figures with exhibitors or third-party licensees.

61.     In or about April 2024, before the GHJ audit commenced, K2 provided WPM and WPM Holdings with updated cumulative royalty accountings for the WPM Projects. Upon information and belief, the figures in those accountings were materially inconsistent with prior K2 communications regarding revenue performance. The figures in those accountings were materially inconsistent with earlier distribution information previously received by WPM, including (among other things) lower reported revenues and higher reported expenses than appeared in earlier materials. K2 has not adequately explained those discrepancies.

///

///

15

**COMPLAINT**

62.    Upon information and belief, K2 has altered or caused to be altered prior-period figures on royalty statements rendered to Plaintiffs. The deductions, line items, and characterizations appearing on K2's cumulative royalty statements have varied across versions of the statements in ways that are not explained by the rendering of additional periods of activity.

63.    For each of the foregoing reasons, Plaintiffs did not discover, and could not with reasonable diligence have discovered, the full extent of K2's breaches and unauthorized conduct until on or after November 1, 2024, when GHJ issued the GHJ Audit Report. K2's failure to render compliant reports, its obstruction of the audit process, its delivery of materially inconsistent prior-period accountings, and its concealment of information regarding its actual distribution activities prevented Plaintiffs from discovering the breaches at an earlier time.

**J.    The Default Term Is Illusory, Unconscionable, and Unenforceable**

64.    The Default Term appearing in Section 13(a) of each of the Ocean Odyssey Agreement and the Wild Continent Agreement purports to restrict the Plaintiffs' right to terminate those agreements for material breach. By its terms, the Default Term provides that the only breach that may be deemed an Event of Default on K2's part is a failure by K2 Films Australia Pty Ltd, a non-party to this action, to make full payment of the K2 Australia Advance and the K2 ROW Advance.

65.    The Default Term is illusory and unenforceable. It purports to immunize K2 from all consequences of its own breaches under the Distribution Agreements — including its breaches of its core reporting, accounting, audit, payment, and Distribution Expense obligations — by declaring that no such breach, however material, can constitute an Event of Default. The effect of the Default Term, if enforced, would be to deprive Plaintiffs of any meaningful right to terminate the Distribution Agreements for K2's breach, while leaving K2 free to breach the agreements at will without risk of termination. A promise that can be breached without consequence is no promise at all; a contract in which one party reserves the right to breach with impunity is illusory.

16

**COMPLAINT**

66.    The Default Term is further unconscionable, both procedurally and substantively. Substantively, the Default Term is one-sided to an extreme degree: it eliminates Plaintiffs' termination rights for any conduct by K2, including conduct that goes to the heart of the parties' bargain — reporting and accounting for gross receipts. No legitimate commercial purpose is served by a provision that permits the distributor to breach its reporting and accounting obligations with impunity while the producer retains full performance obligations. The Default Term is accordingly unenforceable as unconscionable under applicable law.

67.    In the alternative, and without waiver of Plaintiffs' position that the Default Term is illusory and unconscionable, Plaintiffs plead that Plaintiffs are entitled to damages, specific performance, an accounting, and other relief as set forth below, irrespective of whether the Default Term is enforced to preclude termination of the Distribution Agreements.

68.    Plaintiffs have performed all conditions, covenants, and obligations required of them under the Distribution Agreements, or have been excused from performance.

**<u>FIRST CAUSE OF ACTION</u>**

**COPYRIGHT INFRINGEMENT**

**(17 U.S.C. § 501)**

**(By Both Plaintiffs Against Defendant K2 Communications, Inc.)**

69.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 10 through 68 above as though fully set forth herein.

70.    The WPM Footage consists of original works of authorship created by WPM and first published in Australia, a member country of the Berne Convention. Pursuant to 17 U.S.C. §§ 101, 104(b)(2), and 411(a), the WPM Footage constitutes "foreign works" entitled to copyright protection in the United States, and Plaintiffs may maintain this action for infringement of the WPM Footage without prior registration of the WPM Footage with the United States Copyright Office.

17

**COMPLAINT**

71.    WPM and/or WPM Holdings is the owner of the copyright in the WPM Footage and has not assigned, licensed, or otherwise transferred those copyright interests to K2 or to any entity associated with the Unauthorized Productions.

72.    K2 has directly infringed Plaintiffs' exclusive rights in the WPM Footage, in violation of 17 U.S.C. § 501, by marketing, selling, broadcasting, distributing, licensing, and/or displaying within the United States the Unauthorized Productions, which incorporate substantial quantities of WPM Footage, without any license or authorization from Plaintiffs.

73.    K2's infringement was and is willful within the meaning of 17 U.S.C. § 504(c)(2). Prior to the filing of this action, Plaintiffs provided K2 with written notice on multiple occasions that the Unauthorized Productions incorporate WPM Footage without authorization, and demanded that K2 cease distribution of the Unauthorized Productions. Notwithstanding those notices, K2 has continued to distribute the Unauthorized Productions.

74.    As a direct and proximate result of K2's willful copyright infringement, Plaintiffs have suffered, and continue to suffer, substantial damages. Plaintiffs are entitled to recover their actual damages and K2's profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), and, to the extent available under 17 U.S.C. §§ 412 and 504(c), statutory damages.

75.    Plaintiffs are further entitled, to the extent available under 17 U.S.C. §§ 412 and 505, to their reasonable attorneys' fees and costs.

76.    Plaintiffs are entitled to a permanent injunction pursuant to 17 U.S.C. § 502 enjoining K2, its officers, agents, servants, employees, and all persons acting in concert or participation with it, from further marketing, selling, broadcasting, distributing, licensing, and/or displaying the Unauthorized Productions or any other works incorporating WPM Footage without Plaintiffs' prior written authorization.

///

///

18

**COMPLAINT**

77.    Plaintiffs are further entitled to an order impounding and/or requiring the destruction of all copies of the Unauthorized Productions in K2's possession, custody, or control, pursuant to 17 U.S.C. § 503.

## SECOND CAUSE OF ACTION

## BREACH OF WRITTEN CONTRACT

### (Ancient Australia Distribution Agreement)

**(By Plaintiff Wild Pacific Media Pty Ltd Against Defendant K2 Communications, Inc.)**

78.    Plaintiff WPM realleges and incorporates by reference each and every allegation set forth in paragraphs 10 through 68 above as though fully set forth herein.

79.    The Ancient Australia Agreement is a valid and binding written contract between WPM and K2.

80.    WPM performed all conditions, covenants, and obligations required of it under the Ancient Australia Agreement, or was excused from performance.

81.    K2 has materially breached the Ancient Australia Agreement, including by:

    a.    Failing to render royalty reports and payments on a quarterly basis as required by Section 15 of the Ancient Australia Agreement;

    b.    Upon information and belief, failing to report, or underreporting, revenues received from K2's exploitation of Ancient Australia, including revenues from theatrical bookings and exhibitor licenses identified through publicly available advertising and exhibition listings, where the revenue from such bookings does not appear in any statement rendered by K2, or appears at materially lower amounts than actually received;

///

///

///

///

19

**COMPLAINT**

c.  Deducting as Distribution Expenses costs that do not qualify as Distribution Expenses under Section 10 of the Ancient Australia Agreement, including by deducting expenses that were not advanced on behalf of WPM for distribution of the film and expenses for which WPM's prior right of approval was not obtained;

d.  Upon information and belief, in addition to the specific deductions described above, deducting against gross receipts costs that are improper, overstated, unsupported by documentation, and/or not advanced by K2 in connection with distribution of the film;

e.  Thwarting and frustrating WPM's audit rights under Section 17 of the Ancient Australia Agreement, including by delaying the audit process, including by negotiating non-disclosure agreement terms over a period of weeks before agreeing to such terms, by failing to provide a draft non-disclosure agreement for the audit of Ancient Australia, by limiting the scope of audit cooperation, and by failing to provide information and documents reasonably requested by WPM's auditors;

f.  Upon information and belief, misdirecting participation payments properly owed to WPM to third-party entities in violation of the Ancient Australia Agreement; and

g.  Failing to maintain proper, accurate, and complete books and records in relation to Gross Receipts and Distribution Expenses.

82.  As a direct and proximate result of K2's breaches, WPM has suffered damages in an amount to be determined at trial, but in excess of $75,000, plus pre-judgment interest thereon at the maximum legal rate.

///

///

///

///

20

**COMPLAINT**

## THIRD CAUSE OF ACTION

### BREACH OF WRITTEN CONTRACT

### (Ocean Odyssey Distribution Agreement)

**(By Plaintiff Wild Pacific Media Pty Ltd Against Defendant K2 Communications, Inc.)**

83.    Plaintiff WPM realleges and incorporates by reference each and every allegation set forth in paragraphs 10 through 68 above as though fully set forth herein.

84.    The Ocean Odyssey Agreement, as amended by the Ocean Odyssey Amendment, is a valid and binding written contract between WPM, on the one hand, and K2 and K2 Films Australia Pty Ltd, jointly and severally, on the other. Under the express terms of the Ocean Odyssey Agreement, K2 is jointly and severally liable for all obligations of "K2" arising under the Ocean Odyssey Agreement.

85.    WPM performed all conditions, covenants, and obligations required of it under the Ocean Odyssey Agreement, or was excused from performance.

86.    K2 has materially breached the Ocean Odyssey Agreement, including by:

a.    Failing to render quarterly statements during the first two years following delivery, and semi-annual statements thereafter, within 30 days of the end of each Accounting Period, as required by Section 12(a) of the Ocean Odyssey Agreement;

b.    Upon information and belief, failing to report, or underreporting, revenues received from K2's exploitation of Ocean Odyssey, including revenues from theatrical bookings, exhibitor licenses, and other exploitation that WPM has independently identified through publicly available advertising, exhibition listings, and other booking information, where the revenue from such bookings does not appear in any statement rendered by K2;

///

///

///

21

**COMPLAINT**

c. Deducting against gross receipts sums characterized as "Approved COMPANY (Licensor) Finishing Costs 3D" in the amount of USD $163,994 and "Approved COMPANY (Licensor) Expenses" in the amount of USD $125,000, for which WPM's prior written approval was not obtained, contrary to the express terms of Section 1(c) of the Ocean Odyssey Agreement;

d. Upon information and belief, in addition to the specific deductions described above, deducting against gross receipts costs that are improper, overstated, unsupported by documentation, and/or not advanced by K2 in connection with distribution of the film;

e. Applying gross receipts other than in the order specified by the Section 8(c) waterfall;

f. Thwarting and frustrating WPM's audit rights under Section 12(c), including by delaying the audit process, failing to provide a draft non-disclosure agreement for the audit of Ocean Odyssey for more than two months after WPM's auditors' September 24, 2024 request, and failing to provide information and documents requested by WPM's auditors;

g. Upon information and belief, misdirecting participation payments properly owed to WPM to third-party entities in violation of the Ocean Odyssey Agreement; and

h. Failing to maintain proper, accurate, and complete books and records in relation to Gross Receipts and Distribution Expenses.

87. As a direct and proximate result of K2's breaches, WPM has suffered damages in an amount to be determined at trial, but in excess of $75,000, plus pre-judgment interest thereon at the maximum legal rate.

///

///

///

22

**COMPLAINT**

**FOURTH CAUSE OF ACTION**

**BREACH OF WRITTEN CONTRACT**

**(Australia: The Wild Continent Distribution Agreement)**

**(**By Plaintiff WPM Holdings Pty Ltd Against Defendant K2 Communications, Inc.**)**

88.    Plaintiff WPM Holdings realleges and incorporates by reference each and every allegation set forth in paragraphs 10 through 68 above as though fully set forth herein.

89.    The Wild Continent Agreement is a valid and binding written contract between WPM Holdings, on the one hand, and K2 and K2 Films Australia Pty Ltd, jointly and severally, on the other.

90.    WPM Holdings performed all conditions, covenants, and obligations required of it under the Wild Continent Agreement, or was excused from performance.

91.    K2 has materially breached the Wild Continent Agreement, including by:

    a.    Reporting gross receipts, distribution expenses, distribution fees, and the recoupment of advances on a consolidated worldwide basis rather than separately for the ROW Territory and the ANZ Territory as required by Section 8(b) of the Wild Continent Agreement, which breach K2 has acknowledged but failed to cure;

    b.    Charging Distribution Expenses of USD $131,110 on the Initial Statement — in excess of the Section 1(c) cap of USD $1,750 — and thereby overstating Distribution Expenses by USD $129,360, which breach K2 has acknowledged but failed to cure;

///

///

///

///

///

///

23

**COMPLAINT**

c. Issuing, after the GHJ Audit, a revised cumulative royalty statement for the period inception through June 30, 2025, that purports to remove the USD $131,110 in previously claimed Distribution Expenses without any accompanying corrected accounting, explanation, or refund of any amount, and without reissuing separate statements for the ROW Territory and the ANZ Territory as required by Section 8(b) — thereby compounding rather than curing the breaches identified in the GHJ Audit Report;

d. Charging USD $250,000 of ROW Prints and Advertising against gross receipts as a separate line item outside the Section 1(c) cap, rather than recouping Prints and Advertising "as a Distribution Expense" subject to the cap as required by Section 10 of the Wild Continent Agreement, and, upon information and belief, intending to continue to do so in future accountings;

e. Applying gross receipts other than in the order specified by the Section 8(c) waterfall;

f. Failing to render quarterly statements during the first two years following delivery within 30 days of the end of each Accounting Period as required by Section 12(a), and instead providing only periodic cumulative summary statements;

g. Thwarting and frustrating WPM Holdings' audit rights under Section 12(c), including by delaying the audit process, limiting audit cooperation, failing to provide requested information and documents, and, upon information and belief, failing to produce complete source records to the auditors;

h. Upon information and belief, misdirecting participation payments properly owed to WPM Holdings to third-party entities in violation of the Wild Continent Agreement;

24

**COMPLAINT**

i.  Rendering royalty statements that characterize Prints and Advertising treatment as "To Be Determined Once MG Repaid," in violation of Section 10 of the Wild Continent Agreement, which requires Prints and Advertising to be recouped as a Distribution Expense subject to the cap during each reporting period;

j.  Upon information and belief, failing to report revenues received from theatrical bookings, exhibitor licenses, and other exploitation of Australia: The Wild Continent that WPM Holdings has independently identified through publicly available advertising, exhibition listings, and other booking information, where the revenue from such bookings does not appear in any statement rendered by K2;

k.  Upon information and belief, in addition to the specific deductions identified above, deducting against gross receipts costs that are improper, overstated, unsupported by documentation, and/or not advanced by K2 in connection with distribution of the film; and

l.  Failing to maintain proper, accurate, and complete books and records in relation to Gross Receipts and Distribution Expenses.

92.  As a direct and proximate result of K2's breaches, WPM Holdings has suffered damages in an amount to be determined at trial, but in excess of $75,000, plus pre-judgment interest thereon at the maximum legal rate.

## FIFTH CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
(By Both Plaintiffs Against Defendant K2 Communications, Inc.)

93.  Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 10 through 68 above as though fully set forth herein.

///

25

**COMPLAINT**

94.     Each of the Distribution Agreements contains an implied covenant of good faith and fair dealing, which imposes upon K2, among other obligations, the duty to render royalty statements that are accurate, complete, and internally consistent; the duty to maintain books and records that permit the contracting WPM entity to meaningfully exercise its audit rights; the duty not to take action that would deprive the contracting WPM entity of the benefits of the Distribution Agreement; and the duty to act honestly and in good faith in K2's reporting and accounting for exploitation of the licensed film.

95.     Although the express terms of the Distribution Agreements require K2 to render reports and maintain records, the requirement that those reports and records be accurate, complete, and reliable is, to the extent not expressly stated, implied in the Distribution Agreements by operation of the implied covenant of good faith and fair dealing.

96.     K2 has breached the implied covenant of good faith and fair dealing under each of the Distribution Agreements, including by:

a.     Rendering royalty statements that are materially inaccurate, internally inconsistent, and unreliable, with gross receipts and distribution expense figures that fluctuate across reporting periods without adequate explanation;

b.     Altering prior-period figures on subsequently-rendered royalty statements, including by lowering prior-period gross receipts and raising prior-period distribution expenses, in a manner that prevents meaningful period-over-period verification;

c.     Failing to maintain proper, accurate, and complete books and records, and in so doing depriving Plaintiffs of the practical ability to exercise their audit rights;

///

///

///

26

**COMPLAINT**

d.  Obstructing and delaying the independent audit conducted by GHJ, including by refusing to cooperate for extended periods, limiting the scope of audit cooperation, and failing to produce complete source records;

e.  Adopting and maintaining internal accounting policies that are contrary to the Distribution Agreements, including K2's stated policy of deferring Prints and Advertising and other expense recoupment "only once Minimum Guarantees are recouped," contrary to the express reporting and cap provisions of the Distribution Agreements;

f.  Upon information and belief, deducting against gross receipts costs that are improper, overstated, or unsupported by documentation, contrary to K2's implied duty to render accurate, complete, and reliable accountings; and

g.  Engaging in conduct that prevented Plaintiffs from discovering K2's breaches and that thwarted Plaintiffs' ability to verify K2's compliance with the Distribution Agreements, including the conduct described in Section I of the General Allegations.

97.  As a direct and proximate result of K2's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount to be determined at trial, but in excess of $75,000, plus pre-judgment interest thereon at the maximum legal rate.

///

///

///

///

///

///

///

///

**COMPLAINT**

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendant K2 Communications, Inc. as follows:

1.    On the First Cause of Action (Copyright Infringement):

    a.    A permanent injunction pursuant to 17 U.S.C. § 502 enjoining K2, its officers, agents, servants, employees, and all persons acting in concert or participation with it, from further marketing, selling, broadcasting, distributing, licensing, and/or displaying the Unauthorized Productions or any other works incorporating WPM Footage without Plaintiffs' prior written authorization;

    b.    Plaintiffs' actual damages and K2's profits attributable to K2's copyright infringement pursuant to 17 U.S.C. § 504(b), and, to the extent available, statutory damages pursuant to 17 U.S.C. § 504(c), including enhanced statutory damages for willful infringement;

    c.    Reasonable attorneys' fees and costs, to the extent available pursuant to 17 U.S.C. §§ 412 and 505; and

    d.    An order impounding and/or requiring the destruction of all copies of the Unauthorized Productions in K2's possession, custody, or control, pursuant to 17 U.S.C. § 503.

2.    On the Second, Third, and Fourth Causes of Action (Breach of Written Contract):

    a.    Compensatory damages in an amount to be proven at trial, but in excess of $75,000 per claim, plus pre-judgment interest thereon at the maximum legal rate from the date of each breach;

    b.    An accounting of all revenues received by K2 from the exploitation of each of the WPM Projects, and of all amounts properly owed to Plaintiffs thereunder;

///

28

**COMPLAINT**

c. Specific performance of K2's obligations to render corrected, complete, and accurate royalty statements for each of the WPM Projects, addressing the deficiencies identified herein and in the GHJ Audit Report;

d. A judgment declaring that K2 has materially breached each of the Distribution Agreements and that Plaintiffs are entitled to terminate each of the Distribution Agreements, effective as of the date of entry of judgment or such earlier date as the Court may order, with all rights granted to K2 under each Distribution Agreement reverting to the contracting WPM entity upon such termination;

e. A permanent injunction enjoining K2, upon termination of each Distribution Agreement, from any further distribution, exhibition, licensing, or other exploitation of the WPM Project that is the subject of that Distribution Agreement;

f. An order requiring K2 to deliver over to Plaintiffs all original materials and other deliverables in K2's possession, custody, or control relating to the WPM Projects; and

g. Reasonable attorneys' fees and costs, to the extent permitted by contract, statute, or otherwise.

3. On the Fifth Cause of Action (Breach of the Implied Covenant of Good Faith and Fair Dealing):

a. Compensatory damages in an amount to be proven at trial, but in excess of $75,000, plus pre-judgment interest thereon at the maximum legal rate; and

b. Reasonable attorneys' fees and costs, to the extent permitted by contract, statute, or otherwise.

///

///

**COMPLAINT**

4.   On All Causes of Action:

    a.   All costs of suit incurred herein;

    b.   Pre-judgment and post-judgment interest at the maximum legal rate; and

    c.   Such other and further relief as the Court may deem just and proper.

Dated: May 14, 2026

TESSER | GROSSMAN LLP
BRANDON M. TESSER
ROBERT PAREDES

_____
BRANDON M. TESSER
Attorney for Plaintiffs
WILD PACIFIC MEDIA PTY LTD and
WPM HOLDINGS PTY LTD

30
**COMPLAINT**

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs Wild Pacific Media Pty Ltd and WPM Holdings Pty Ltd hereby demand a trial by jury of all issues so triable.

Dated: May 14, 2026
                           TESSER | GROSSMAN LLP
                           BRANDON M. TESSER
                           ROBERT PAREDES

                           _____

                           BRANDON M. TESSER
                           Attorney for Plaintiffs
                           WILD PACIFIC MEDIA PTY LTD and
                           WPM HOLDINGS PTY LTD

## DEMAND FOR JURY TRIAL